UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KEITH L. LASTER,

               Petitioner,

     -vs-

SUPERINTENDENT,
FIVE POINTS CORRECTIONAL FACILITY


              Respondent.

_____

**DECISION AND ORDER**
**No. 12-CV-06054MAT**

## I.  Introduction

*Pro se* Petitioner Keith L. Laster ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to two judgments entered December 21, 2005, in New York State, County Court, Monroe County, convicting him, upon a jury verdict, of five counts of Rape in the First Degree (N.Y. Penal Law ("Penal Law") § 130.35[1]), three counts of Sexual Abuse in the First Degree (Penal Law § 130.65[1]), and one count of Sodomy in the First Degree (Penal Law § 130.50).

## II.  Factual Background and Procedural History

### A.  Introduction

Between November 28 and December 15, 1995, Petitioner raped three school-age girls (C.S., L.B., D.R.).  Each of the rapes

occurred in the City of Rochester, New York during the early morning hours as each girl walked to her bus stop. Monroe County Indictment No. 466/2000 charged Petitioner as "John Doe", under his DNA profile, with four counts of Rape in the First Degree, two counts of Sexual Abuse in the First Degree, and one count of Sodomy in the First Degree. See Monroe County Ind. No. 0466, filed 09/22/2000 at Resp't Ex. B.

On the morning of October 15, 1997 in Rochester, Petitioner raped another school-age girl, E.A., as she walked to her bus stop. Monroe County Indictment No. 622/2005 charged Petitioner, under his true name and his DNA profile, with Rape in the First Degree and Sexual Abuse in the First Degree. See Monroe County Ind. No. 0622, filed 08/26/2005 at Resp't Ex. B.

On November 4, 2005, Petitioner proceeded to trial on both indictments before the Hon. Patricia Marks and a jury.

**B.   The Trial**

**1.   The People's Case**

**VICTIM #1 (C.S.)**

At 6:30 a.m. on November 28, 1995, thirteen-year-old C.S. left her home on Glendale Park, and began walking to her school bus stop several blocks away. C.S. observed Petitioner walking towards her, who eventually came up behind C.S. when she felt something press against her back. Petitioner told her that he had a gun, put his

hand over C.S.'s mouth, and told her that she should do what he told her to do.  Trial Trans. [T.T.] 249-254.

Petitioner pulled C.S. across the street to an enclosed area between a garage and a boat.  He told C.S. to remove her pants. C.S. complied, and Petitioner placed his hand on her vagina. Petitioner directed her to lie on the ground and close her eyes, which she did.  Petitioner spread C.S.'s legs apart and inserted his penis in her vagina.  C.S. cried out in pain, and Petitioner told her to be quiet.  T.T. 254-256.

Petitioner told C.S. that he knew where she lived and he would hurt her and her family if she told anyone what happened. Petitioner then left.  C.S. was unsure of his identity because she had her eyes closed throughout the incident and never got a good look at Petitioner's face.[1]  C.S. ran home after the rape and told her father what had happened.  Police officer Mildred Witherspoon-Ruffin of the Rochester Police Department("RPD") responded to C.S.'s home at 6:53 a.m.  She spoke to C.S. and then did a neighborhood check for the assailant.  T.T. 256-257, 263-268.

C.S. went to Rochester General Hospital where physician's assistant Marion Maraszkiewicz ("Maraszkiewicz") examined her. At the trial, Maraszkiewicz testified that C.S. was "very tearful and

---

[1]

After the incident, C.S. informed police that she believed her mother's boyfriend at the time, David Fletcher ("Fletcher"), was the man who raped her. T.T. 263-264.  On cross-examination, C.S. testified that she had initially identified Fletcher as the perpetrator based on "his build."  T.T. 263.

. . . cried throughout most of [their] interaction." T.T. 299. During the examination, Maraszkiewicz observed a laceration to C.S.'s perineum and noticed that her hymenal ring was swollen and bruised. Maraszkiewicz found clear liquid in C.S.'s vagina and collected samples and created slides for a rape kit. She also retrieved C.S.'s underwear and two vials of C.S.'s blood and placed them inside envelopes. T.T. 297-306.

Maraszkiewicz gave the rape kit and C.S.'s clothing to Officer Witherspoon-Ruffin who, in turn, logged the evidence into the property clerk's office and then transported it to the Monroe County Crime Laboratory. T.T. 270-271, 306.

## VICTIM #2 (L.B.)

On November 30, 1995, at 6:40 a.m., seventeen-year-old L.B. left her home on South Plymouth Avenue and walked to her school bus stop several blocks away. As she walked behind a nearby school and recreation center, Petitioner ran up from behind her and collided into her forcefully. Petitioner grabbed L.B. around her mouth, causing her braces to pierce her top lip. L.B. attempted to bargain with Petitioner and told him to take her coat or her pager. Petitioner told her that he did not want them, and began to "back[] [her] up towards the corner area . . . between where the recreation center meets with the school." T.T. 277-282.

Petitioner pressed a cold object against L.B.'s head that she believed to be a gun. Petitioner repeatedly told her to "shut the

fuck up," called her a "bitch," and threatened to kill her. Petitioner told L.B. to remover her pants and then tripped her, causing her to fall down face-forward.  L.B. felt a sharp pain in her knee and noticed that it was cut.  Petitioner then pulled down L.B.'s underwear and put his hands on the back of her neck, holding down her head.  Petitioner inserted his penis in her vagina.  While Petitioner was raping L.B., she saw a gun on the ground.  T.T. 283-285.

Petitioner then got up, buckled his pants, and told L.B. to remain on the ground.  Petitioner ran away.  L.B. put her cloths back on and went to her grandmother's house nearby.  L.B. told her grandmother what had happened and then went to the hospital. T.T. 268, 294-295.

At Strong Memorial Hospital, Susan Dantoni, M.D., examined L.B., who was "calm and rational, but tearful."  T.T. 319.  She observed cuts on L.B.'s lip and knee.  She aspired secretions from L.B.'s vagina and viewed them under a microscope.  Dr. Dantoni observed non-motile sperm.  She then collected fluid samples, including blood samples from L.B., and prepared a rape kit. T.T. 317-324.  RPD Officer Tim Lawler recovered L.B.'s earmuffs from the location of the rape.  He went to Strong Memorial Hospital where he met L.B. and observed the cuts on her lip and knee.  He retrieved the rape kit from Dr. Dantoni and brought it to the

property clerk's office.  Shortly thereafter, he signed it into the Monroe County Crime Laboratory.  T.T 309-316.

## Victim #3 (D.R.)

Fifteen days later on December 15, 1995, at approximately 7:00 a.m., twelve-year-old D.R. left her home on Maple Street intending to walk several blocks to her school bus stop.  She saw Petitioner coming toward her from the parking lot of an automobile parts store.  Petitioner grabbed D.R. from behind, put one arm around her stomach and covered her mouth with his other hand. Petitioner tried to drag her, and D.R. screamed.  Petitioner told her to "shut up" and called her a "bitch."  Petitioner threatened to kill her, and dragged her to a dumpster next to the automobile parts store.  As he did so, D.R. fought with him and tried to break free.  T.T. 328-336.

Petitioner told D.R. to take off her pants.  When D.R. told him that she did not know how, he removed them himself.  Petitioner told her to kneel down on all fours, which she did.  Petitioner asked her how old she was, to which D.R. responded eleven-years-old.  D.R. told Petitioner she was having her period, and Petitioner told her that he did not care.  Petitioner's penis touched D.R.'s anus.  Petitioner then penetrated D.R.'s vagina with his penis.  When Petitioner finished, he told D.R. to lie on her back and cover her eyes.  He told her that if she did not "shut up," he would put his penis in her mouth.  D.R. covered her eyes

and her mouth, and Petitioner inserted his penis in her vagina again.  D.R. asked if she could leave when he finished, to which Petitioner did not respond but, instead, told her to count.  D.R. complied, and Petitioner then left.  T.T. 337-340.

D.R. put her clothes back on and went home.  She cried and told her stepfather that she was raped and then called 911.  The police responded to D.R.'s home, and D.R. showed RPD Officer Allen Luccitti where the rape had taken place.  D.R. went to Rochester General Hospital where she realized that she had lost one of her gold hoop earrings.  Thomas Walton, an evidence technician with the RPD, subsequently found the earring at the location of the rape. T.T. 340-342, 376, 377, 380, 383.

At the hospital, Susan Psaila, M.D., examined D.R., who was tearful, upset, and had abrasions on her legs.  During an internal pelvic examination, Dr. Psaila observed notching on D.R.'s hymen that was consistent with a sexual assault.  She prepared a rape kit by using cotton swabs to collect fluid samples from D.R.'s vagina. She placed D.R.'s underwear in an evidence bag and placed the remaining clothing in another bag.  In November 1996, D.R. returned to the hospital to provide a blood sample.  T.T. 341, 455-463, 418-419.

On November 27, 1996, Sergeant Mark Mariano, who has been assigned to investigate the three 1995 rapes, transported all of the biological evidence from the Monroe County Crime Laboratory to

the New York State Police Crime Laboratory in Albany, New York. T.T. 420-421, 446.

**Victim #4 (E.A.)**

About two years after the first of the 1995 rapes, on October 15, 1997, at 6:30 a.m., thirteen-year-old E.A. left her home on Ambrose Street in Rochester to walk several blocks to her school bus stop.  E.A. noticed Petitioner standing beside her house and then observed him enter her backyard.  Petitioner wore a bandana that covered the lower half of his face.  E.A. walked toward the bus stop and then saw Petitioner again standing beside another house.  He began walking behind her.  When E.A. sped up, Petitioner  also sped up.  E.A. began running and Petitioner chased her and eventually grabbed her from behind.  T.T. 395-401, 407.

Petitioner put his arm around E.A.'s mouth and neck.  E.A. fell to her knees.  Petitioner grabbed her and forced her to stand up.  He told her to be quiet and to keep walking.  E.A. noticed that Petitioner held a brown-handled knife.  He walked her through a gate to the backyard of a house and told her to remove her clothes.  E.A. did not want to, and Petitioner threatened to kill her if she did not undress.  E.A. eventually pulled down her pants, and Petitioner told her to get on the ground.  E.A. laid on her back, and Petitioner told her to close her eyes, which she did. T.T. 401-405.

Petitioner touched E.A.'s vagina with his hand.  He then put his penis in her vagina.  E.A. told Petitioner to stop, but he did not and called her a "bitch."  After Petitioner finished, he told E.A. to close her eyes and count to twenty-five.  T.T. 405-406. When E.A. went to put her clothes on, she noticed that she was bleeding.  T.T. 407.

E.A. eventually put her clothes back on and went to the bus stop.  There, she ran into a family friend who brought her home. Petitioner told her mother what had happened.  E.A.'s mother noticed that her clothing was dirty and bloody and E.A. was "very nervous" and bleeding between her legs.  The police responded to her home, and RPD Officer Scott Wehr brought her to the hospital. T.T. 406-409, 413, 452.

Lauren Burke, M.D. completed a victim assault kit for E.A. at Strong Memorial Hospital.  She noticed that E.A. appeared to be in shock.  Her physical examination of E.A. revealed that E.A. had a bruised labia and bruised hymen.  She collected E.A.'s clothing and observed blood stains on E.A.'s pants and underwear.  She swabbed fluid specimens from E.A.'s vagina and anus and placed E.A.'s underwear in a sealed bag.  She then sealed the rape kit and gave it to Officer Wehr, who subsequently gave it to Officer Walton, who logged it the property clerk and transported it to the Monroe County Public Safety laboratory.  T.T. 393-394, 414, 526-540.

Preliminary testing performed at the Monroe County Public Safety Laboratory in December 1995 indicated that fluid samples obtained from each of the 1995 rape victims contained sperm. Testing performed on E.A.'s vaginal and anal fluid samples and clothing also indicated the presence of sperm.  The rape kits and other evidence were sent to the New York State Police Crime Laboratory and Cellmark, a private laboratory, for further testing. T.T. 542-562, 604-605, 616-624, 631-639.

On January 29, 1997, Peter Wistort ("Wistort"), a forensic scientist at the New York State Police Forensic Investigation Center ("NYSPFIC") received the 1995 victims' rape kits and clothing samples from the Monroe County Public Safety Laboratory. Wistort was also able to establish that the sperm collected from the 1995 victims did not match anyone in the state or national DNA database.  T.T. 713-770.  In October and November 1997, Allison Eastman ("Eastman"), also a forensic scientist at NYSPFIC, performed testing on the DNA evidence recovered from the 1995 victims.  Based on this testing, she concluded that all of the 1995 victims shared a common sperm donor.  T.T. 973-1024.

On May 5, 1999, Cellmark received the DNA samples from E.A.'s rape kit.  Kathryn Colombo, a DNA analyst at Cellmark, performed testing on the samples and developed a DNA profile for the sperm donor recovered from E.A.'s vaginal swab.  T.T. 771-804, 872.

On June 20, 2005, Sergeant Mariano and RPD Investigator Daniel Gleason traveled to 14 Reeves Drive in Eufaula, Alabama, where Petitioner was living at the time.  There, they observed Petitioner seated in the driver's seat of a car.  Federal marshals and local police who accompanied them directed Petitioner to exit the vehicle.  Petitioner ignored these directions, and the local police eventually pulled Petitioner from the vehicle.  T.T. 422-423.

Sergeant Mariano rode with Petitioner in the back seat of a federal marshal's vehicle to a federal building in Montgomery, Alabama.  During the ride, Petitioner asked Sergeant Mariano whether he was going back to Rochester, and Sergeant Mariano told him it was likely he would be within several days.  Also during the ride, Petitioner told Sergeant Mariano that the name on his birth certificate was Lassiter (not Laster), that he was originally from Eufaula, Alabama, and that he had moved to Rochester in 1990. Petitioner asked Sergeant Mariano who was in the front seat of the vehicle, to which Sergeant Mariano responded that there were two deputy federal marshals from Rochester.  When they arrived at the federal building, while still in the vehicle, Sergeant Mariano read Petitioner his <u>Miranda</u> rights and Petitioner confirmed that he understood them and waived his rights.  Petitioner was taken into the federal building for questioning.  Sergeant Mariano showed Petitioner a photograph of E.A.  Petitioner stated that he lived at 65 Ambrose Street in 1997 and recognized E.A. from the

neighborhood.  He denied having sexual intercourse with her, and indicated that he had been in her house and "that he wanted to get with her mother."  Petitioner claimed that he had helped E.A.'s mother carry her groceries and, on one occasion, E.A.'s mother had removed her breast from her shirt and Petitioner had sucked on it.[2] According to Petitioner, things had never gone further with E.A.'s mother because "there were always little children around . . . ." T.T. 425-434.

On July 12, 2005, Investigator Gleason obtained a DNA sample from the inside of Petitioner's cheek by using a buccal swab kit. He logged the sample with the property clerk's office and, on July 13, 2005, delivered it to NYSPFIC.  T.T. 509-514.

At NYSPFIC, Eastman used DNA testing to develop a DNA profile for the buccal swab sample collected from Petitioner.  The results of this testing showed that Petitioner's genetic profile matched that of the sperm donor to all four victims.  Eastman calculated that the statistical probability that another individual would have Petitioner's genetic profile was one in 300 billion.  T.T. 1047-1055.

---

[2]

At trial, E.A.'s mother denied that any such encounter ever took place or that anyone ever helped her with her groceries at her house on Ambrose Street prior to the rape.  She also stated that she had never seen Petitioner prior to the day of her testimony.  T.T. 453.

### 2.   The Defense's Case

Petitioner presented no evidence at trial.

### 3.   Verdict and Sentence

On November 16, 2005, the jury found Petitioner guilty on all counts.   Subsequently,   the   trial   court   imposed   an   aggregate sentence of 85 ½ to 171 years imprisonment.   Sentencing Mins. [S.M.] 2-18.

### C.   Direct Appeal

Petitioner   appealed   his   judgment   of   conviction   in   the Appellate Division, Fourth Department on the following grounds: (1) the "John Doe" indictment that identified Petitioner solely by a DNA sequence was jurisdictionally defective; (2) the "John Doe" indictment deprived Petitioner of his right to be notified of the charges against him because it was unintelligible to anyone lacking a scientific background in DNA analysis; (3) his confrontation rights were violated because he was not permitted to cross-examine the   individuals   who   generated   certain   DNA   evidence   that   was introduced against him; (4) the trial court's evidentiary rulings prevented Petitioner from putting forth a meaningful defense; and (5) consecutive sentences were incorrectly imposed on rape counts pertaining to a single criminal act.   See Resp't Ex. A.   The Appellate Division modified Petitioner's conviction by directing that two of the rape counts run concurrent to one another, and otherwise affirmed the conviction.   See People v. Laster, 78 A.D.3d

-13-

1479 (4th Dep't 2010) (Resp't Ex. E); <u>lv. denied</u>, 16 N.Y.3d 798 (2011).

**D.   The Federal Habeas Corpus Petition**

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) the 2000 John Doe indictment was rendered defective "by substituting a fictitious name with the [Petitioner's] name and changing the theory or theories of the indictment, without the authority of the grand jury when no evidence was presented to the grand jury for independent testing and comparison;" (2) "defense counsel's ability to develop a meaning[ful] defense was hampered by the trial court's continued interference in cross-examination;" (3) Petitioner's confrontation rights were violated where "defense counsel was prevented [from] questioning[] the forensic analyst who conduct[ed] the DNA analysis on an evidence sample"; and (4) "defense counsel was prevented from entering into evidence a '96' laboratory receipt" which would have tended to prove that "the laboratory had access to [Petitioner's] DNA before July 13, 2005, when another sample was submitted to the laboratory."   <u>See</u> Pet. ¶22, Grounds One-Four.

For the reasons that follow, Petitioner's request for habeas relief is denied and the petition is dismissed.

**III. Petitioner's Motions to Appoint Counsel**

On May 11, 2012 and June 22, 2012, Petitioner filed motions to appoint counsel.[3] Dkt. Nos. 9, 12.

The Supreme Court has clearly held that prisoners have no constitutional right to counsel when bringing collateral attacks upon their convictions. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); accord Green v. Abrams, 984 F.2d 41, 47 (2d Cir. 1993). Rather, the appointment of counsel is a matter of discretion. Wright v. West, 505 U.S. 277, 293 (1992).

In determining when a district court may appoint counsel under 28 U.S.C. § 1915(d) for indigents in civil cases, such as petitions for a writ of habeas corpus under 28 U.S.C. § 2254, the court first should "determine whether the indigent's position seems likely to be of substance." Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997). Once it is determined that the claim meets the threshold merits requirement, the Court should consider a number of other factors, including (1) the nature of the factual issues the claim presents, and petitioner's ability to conduct an investigation of the facts; (2) whether conflicting evidence implicating the need for cross-examination will be the major proof

---

[3]    Petitioner's May 11, 2012 motion was stylized as a letter to the Court, inquiring as to how he could go about seeking the appointment of counsel. Dkt. No. 9. The Court construed this as a motion to appoint counsel, and docketed it as such. Nonetheless, on June 22, 2012, Petitioner filed a formal motion to appoint counsel. Dkt. No. 12. Hence, the docket sheet reflects that there are two pending motions to appoint counsel.

presented to the fact finder; (3) petitioner's apparent ability to present the case; (4) whether the legal issues involved are complex; (5) whether appointment of counsel would lead to a quicker and more just determination of the case; and (6) petitioner's efforts to obtain counsel.  <u>Hodge v. Police Officers</u>, 802 F.2d 58, 61-62 (2d Cir. 1986).

Petitioner states that he requires legal assistance in the instant proceeding because: (1) "[t]his is a complex case, it contains numerous legal issues"; (2) "[he] is not familiar with the law that well and has no legal education, only the legal course taken at his place of confinement"; (3) "[he] only has a GED"; (4) "[t]he case will be in sharp conflict, which [i]nvolves constitutional issues"; (4) "[he] do[es] not have adequate access to the law library"; and (5) "[he] [is] unable to investigate crucial facts or issues in [his] case that may require expert testimony to be resolved."  Dkt. No. 12 at ¶¶ 3-8.  Despite his contentions, however, Petitioner has not shown himself to be unable to present the facts relevant to disposition of his habeas petition or to understand his legal position. Similarly, he has not demonstrated that the legal issues in his case are so complicated as to require the assistance of an attorney, or that appointment of counsel would lead to a more just determination.

The Court finds that the interests of justice do not necessitate the appointment of counsel in this case, and

Petitioner's motions to appoint counsel (Dkt. Nos. 9, 12) are denied.  The denial is with prejudice, given the Court's concomitant dismissal of his habeas petition on the merits.

## IV.   The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).  "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts."  Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).  With the exception of ground one, all of Petitioner's claims are unexhausted.

## V.   The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based

on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2).

**VI.  Analysis of the Petition**

**1.    Ground One of the Petition is Not Cognizable**

At ground one of the petition, Petitioner asserts that the 2000 "John Doe" indictment was rendered defective because it charged him under a fictitious name and "chang[ed] the theory or theories of the indictment, without the authority of the grand jury when no evidence was presented to the grand jury for independent testing and comparison."   Pet. ¶ 22, Ground One.   As discussed below, this claim is not cognizable on federal habeas review.

Claims concerning state grand jury proceedings do not entitle a petitioner to federal habeas relief.   See Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) (finding that "claims concerning a state grand jury proceeding are . . . foreclosed in a collateral attack brought in a federal court").   Indictment by a grand jury in a New York State is a right dependent on the New York State Constitution and other state laws, not on federal law, and federal habeas relief may not be granted for violations of state law.   See, e.g., Venable v. Walsh, 2009 U.S. Dist. LEXIS 27887, at *31 (E.D.N.Y. Mar. 19, 2009) (finding that a defective state indictment claim "fails to state a violation of federal law"); Fulton v. Greene, 2009 U.S. Dist. LEXIS 102971, at *14 (W.D.N.Y. Nov. 5, 2009) ("It is

-18-

well-settled that any errors in state grand jury proceedings involving sufficiency of grand jury evidence, use of misleading and prejudicial evidence, and instructions given to the grand jury do not entitle a petitioner to habeas relief."); Whaley v. Graham, 2008 U.S. Dist. LEXIS 82987, at *21-*22 (E.D.N.Y. Oct. 15, 2008) ("As a threshold matter, the form of a grand jury indictment is statutorily created . . . and such alleged defects in a state grand jury proceeding cannot provide grounds for habeas relief.").

Further, even if a defective state indictment constituted proper grounds for federal habeas review, any injury resulting from the defective indictment was cured by the jury's verdict of guilt beyond a reasonable doubt at Petitioner's trial. See Thigpen v. Brown, 2008 U.S. Dist. LEXIS 101679, at *39 (E.D.N.Y. Sept. 26, 2008) (holding that "any problem with the indictment was cured upon petitioner's conviction") (citing United States v. Mechanik, 475 U.S. 66, 73 (1986))); Chacko v. United States, 2005 U.S. Dist. LEXIS 11380, at *16 (S.D.N.Y. June 8, 2005) (finding that "an error in a grand jury proceeding is generally considered harmless once a defendant has been convicted at trial after a jury has found that defendant guilty of crimes charged in the indictment beyond a reasonable doubt").

Accordingly, this claim is denied because Petitioner does not raise a question of federal law appropriate for federal habeas

review and, in any event, any defect in his indictment was cured by the finding of guilt beyond a reasonable doubt by the jury.

**2.    The Remaining Claims in the Petition are Unexhausted but Deemed Exhausted and Procedurally Defaulted**

Petitioner's remaining claims - grounds two, three, and four of the petition -- are unexhausted because they were not properly raised in the state courts.   Nonetheless, as discussed below, because Petitioner no longer has a state court forum in which to exhaust the claims, the Court deems them exhausted but procedurally defaulted from habeas review.

To fulfill the exhaustion requirement, a habeas petitioner must have afforded the state courts a fair opportunity to consider his federal claim.   Picard v. Connor, 404 U.S. 270 (1971).   This means that a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition.   See Grey v. Hoke, 933 F.2d 117, 119 (2d Cir. 1991).   In this case, Petitioner raised the instant remaining claims on direct appeal, but failed to include them in his leave application to the New York Court of Appeals. See Resp't Ex. F.   In his leave application, Petitioner stated as follows:

> This case provides this [c]ourt the opportunity to determine: 1) [w]hether an indictment that identified the accused solely by a DNA sequence was jurisdictionally defective because no evidence was presented to the grand jury to link the DNA sequence to any particular indictment;  and 2) [w]hether an

> indictment that identified the accused solely
> by a DNA sequence violated Mr. Laster's right
> to be fairly notified that he was the person
> accused in the indictment.

Id. Petitioner's failure to seek leave of the instant remaining claims rendered them unexhausted for federal habeas review purposes. See Grey, 933 F.2d at 120 (where leave application argued one claim but omitted two others, petitioner "did not fairly apprise the court" of the omitted claims, rendering them unexhausted).

Respondent argues that the record-based claims should be deemed exhausted but found to be procedurally barred from habeas review because Petitioner has no means to exhaust the claims in state court. See Resp't Mem. of Law at 16-18.  The Court agrees. See Grey, 933 F.2d at 120-21 ("[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.'") (quoting Harris v. Reed, 489 U.S. 255, 263 n.9 (1989)); Spence v. Superintendent, 219 F.3d 162, 170 (2d Cir. 2000) ("Because [petitioner] failed to raise his claim in the ordinary appellate process and can now no longer do so, it is procedurally defaulted.")); N.Y. Crim. Proc. Law § 440.10(2)(a) (court must deny motion to vacate where claim was determined on the merits on direct appeal).

Because this claim is procedurally barred, it may only be reviewed if Petitioner establishes cause for the default and

resulting prejudice, or that a fundamental miscarriage of justice will result from the Court's failure to review the claim.   See e.g., <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001); <u>accord</u> <u>Carvajal v. Artus</u>, 633 F.3d 95, 104 (2d Cir. 2011) ("If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we must deem the claim [ ] procedurally defaulted.'") (quoting <u>Aparicio</u>, 269 F.3d at 90;  alteration in <u>Carvajal</u>).

Petitioner has not alleged cause and prejudice to overcome the procedural default.   Moreover, for purposes of the miscarriage-of-justice exception, Petitioner has made no showing that he is "'actually innocent' (meaning factually innocent) of the crime for which he was convicted." <u>Carvajal</u>, 633 F.3d at 108 (citing <u>Bousley v. United States</u>, 523 U.S. 614, 622, 623 (1998)). Accordingly, Petitioner's remaining claims -- grounds two, three, and four of the petition -- are procedurally defaulted and denied on this basis.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.   Petitioner's motions to appoint counsel (Dkt. Nos. 9, 12) are denied.   Because Petitioner has failed to make "a substantial showing of a denial of a

constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     December 17, 2012
           Rochester, New York